1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                      FOR THE DISTRICT OF OREGON

11   NICHOLAS FLOYD HLAVINKA,        )
                                      )
12                  Petitioner,       )
                                      )      No.  CV-09-3-HU
13        v.                          )
                                      )
14   WILLIAM McNAMEE, Field           )
     Director of United States        )
15   Citizenship and Immigration      )
     Services, Portland, Oregon;      )
16   UNITED STATES CITIZENSHIP AND    )
     IMMIGRATION SERVICES,            )      OPINION & ORDER
17                                    )
                    Respondents.      )
18   ─────────────────────────────────)

19   Jesse Maanao
     Tilman Hasche
20   Parker, Bush & Lane
     1336 E. Burnside, Suite 200
21   Portland, Oregon 97214
          Attorneys for Petitioner
22
     Michael F. Hertz
23   J. Max Weintraub
     Stacey I. Young
24   Office of Immigration Litigation, District Court Section
     United States Department of Justice
25   P.O. Box 868, Ben Franklin Station
     Washington, D.C. 20044
26   Kent Robinson
     Acting United States Attorney
27   District of Oregon
     James E. Cox, Jr.
28   Assistant United States Attorney


1 - OPINION & ORDER

United States Attorney's Office, District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
        Attorneys for Respondents

HUBEL, Magistrate Judge:

    The matter before the court is respondents' motion to dismiss the petition.

## Factual Background

    Petitioner Nicholas Hlavinka, a United States citizen, brings this action challenging the denial by the United States Citizenship and Immigration Service ("USCIS") of his Petition for Alien Relative ("I-130 Petition"), filed on behalf of his wife, Luzviminda Hlavinka. In an I-130 Petition, a citizen or lawful permanent resident of the United States seeks to establish a relationship to alien family members who wish to immigrate to the United States.

    Mrs. Hlavinka is a citizen of the Philippines. She has been married three times. Petition ¶ 12. She married her first husband, Alejandro Donato, in the Philippines in 1982. Id. at ¶ 18; USCIS Denial of Petitioner's Form I-130, Respondent's Memorandum, Exhibit C. She states in her affidavit that Donato abandoned her when she was seven months pregnant with their child. Id.

    She married her second husband, Wendell Leon Floyd, approximately 13 years later, in July 1995 (the Floyd marriage). Mrs. Hlavinka acknowledged to USCIS that she and Mr. Floyd submitted a fraudulent Filipino death certificate for Donato to the former Immigration and Naturalization Service ("INS"), along with a certificate for their marriage stating she was a widow, because divorce is not permitted in the Philippines and annulments are very

2 - OPINION & ORDER

expensive and time-consuming. Petition ¶¶ 15, 16; Affidavit of L. Hlavinka in Support of Form I-485, Respondent's Memorandum, Exhibit B ("L. Hlavinka Affidavit"), p. 1. Mrs. Hlavinka was admitted to the United States on February 11, 1997 as the conditional permanent resident spouse of a United States citizen.

Mrs. Hlavinka separated from Mr. Floyd on May 31, 1997; she states in her affidavit that she left him because he beat her, psychologically abused her, and threatened to kill her with a gun he kept in the house. Id. The Columbia County Circuit Court entered a final decree of dissolution for the Floyd marriage in July 1998. Id. The USCIS terminated Mrs. Hlavinka's conditional permanent resident status, based on its finding that Mrs. Hlavinka married Mr. Floyd in order to obtain an immigration benefit. Petition ¶¶ 15, 16.

Mrs. Hlavinka married Nicholas Hlavinka on December 30, 1998, a marriage that Mrs. Hlavinka admits was invalid because she was still legally married to Donato. L. Hlavinka Affidavit, p. 3. The Hlavinkas married a second time in June 2002, and a third time on May 12, 2003. Id.

In June 2003, Nicholas Hlavinka filed the I-130 Petition on behalf of his wife. Petition ¶ 16. The I-130 Petition was denied on the ground that Mrs. Hlavinka violated 8 U.S.C. § 1154(c) by entering into the Floyd marriage for the purpose of obtaining an immigration benefit. Petition ¶ 16. The decision was appealed to the Board of Immigration Appeals ("BIA"). The BIA found insufficient evidence to conclude that Mrs. Hlavinka violated 8 U.S.C. § 1154(c), and remanded the case to USCIS. Petition ¶ 17. ///

3 - OPINION & ORDER

On remand, USCIS, through Acting Field Office Director Barbara Kveton, again denied the I-130 Petition (the FO decision). The FO decision cited to Mrs. Hlavinka's Application to Register Permanent Residence or Adjust Status ("I-485 Petition") in which she stated:

> I engaged in misrepresentation when my first US citizen husband, Wendell Leon Floyd, and I submitted [fraudulent] [sic] death certificates for my first husband, Alejandro Donato, to convince the US Embassy that Mr. Floyd and I were validly married in order for me to obtain my immigrant visa to enter the United States.

Respondent's Memorandum at Exhibit C, p. 3 (quoting Exhibit A, p. 5). USCIS concluded that by Mrs. Hlavinka's "own admissions in her affidavits and on her I-485 Petition, and upon review of the entire record of proceeding it is clear that [Mrs.] Hlavinka attempted to enter into a marriage to evade immigration law." Id. at p. 4.

On October 25, 2007, the BIA affirmed the FO decision denying Hlavinka's I-130 Petition. Respondent's Memorandum, Exhibit D. Mr. Hlavinka petitions for review in this court.

## Standard

The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, contains several anti-fraud provisions that bar entry to the United States. The most expansive is the general fraud bar provided at 8 U.S.C. § 1182(a)(6)(C)(i), which bars an "alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this Act..." The marriage fraud bar, codified at 8 U.S.C. § 1154(c), applies when "the Attorney General has determined that the alien has attempted ... to enter into a marriage for the purpose of evading the immigration laws." Petitioner concedes that it is

4 - OPINION & ORDER

nearly certain, given his wife's admissions, that Mrs. Hlavinka will be subject to the general fraud bar, but nonetheless asserts that the marriage bar is inapplicable.

Judicial review of the BIA's determination that an alien committed marriage fraud is "an intrinsically fact-specific question" that is reviewed under a substantial evidence standard, with the agency having the burden of producing substantial evidence in support of its determination. Nakamoto v. Ashcroft, 363 F.3d 874, 881 (9th Cir. 2004). The court must determine whether substantial evidence supports a finding by clear and convincing evidence that Mrs. Hlavinka committed marriage fraud. Id. at 882, citing Khodagholian v. Ashcroft, 335 F.3d 1003, 1006 (9th Cir. 2003).

**Discussion**

The Petition alleges that respondents erred when they "concluded that document fraud alone conclusively establishes marriage fraud for purposes of [8 U.S.C. § 1154(c)]." Petition ¶ 20. The marriage fraud bar, 8 U.S.C. § 1154 (c), provides that no petition for immigrant status shall be granted if:

> (1) the alien [sought] an immediate relative or preference status as the spouse of a citizen of the United States ... by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

See also 8 C.F.R. § 204.2(a)(1)(ii)(USCIS may not approve a visa petition for an alien who "has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.")

///

5 - OPINION & ORDER

1   Respondents argue that the agency did not conclude that Mrs.
2   Hlavinka's document fraud alone established marriage fraud; rather,
3   they argue that in its denial of the I-130 petition, the agency
4   found that "the entire record of proceeding" established a
5   conspiracy to enter into a marriage for the purpose of evading the
6   immigration laws. See Respondents' Memorandum, Exhibit C, p. 3.
7   Likewise, respondents argue, the BIA did not, in its October 25,
8   2007 decision, conclude that Mrs. Hlavinka's document fraud,
9   standing alone, constituted marriage fraud, but rather that her
10  "bigamous marriage to Mr. Floyd was an attempt to enter into a
11  marriage for purposes of evading the immigration laws." Id. at
12  Exhibit D. Therefore, the government argues, both USCIS and the BIA
13  determined that it was Mrs. Hlavinka's bigamous marriage, not just
14  the falsified death certificate and marriage certificate, that
15  constituted marriage fraud for purposes of 8 U.S.C. § 1154(c).

16  Petitioner argues that the standard for determining, under §
17  1154(c), whether marriage fraud has been committed is not whether
18  the marriage in question was *legally valid*, but rather whether the
19  marriage was entered into without the intent to establish a life
20  together. Petitioner cites several cases from this jurisdiction to
21  this effect.[1]

22
23
24  [1] Lutwak v. United States, 344 U.S. 604 (1953)(marriage is
25  bona fide when parties have undertaken to establish a life
26  together); Bark v. INS, 511 F.2d 1200, 1238 (9th Cir.
27  1975)(marriage a sham if bride and groom did not intend to
28  establish a life together at the time they were married); Garcia-

6 - OPINION & ORDER

1    Petitioner particularly relies on <u>Johl v. United States</u>, 370

2  F.2d 174, 177 (9th Cir. 1966) and <u>Nakamoto</u>. In <u>Johl</u>, the court held,

3        The immigration law, in granting advantages to those who
         have married American citizens, is not talking about
4

---

5  <u>Jaramillo v. INS</u>, 604 F.2d 1236, 1237 (9th Cir. 1979)("It is

6  within the authority of the INS to make inquiry into the marriage

7  to the extent necessary to determine if it was entered for the

8  purpose of evading the immigration laws. A marriage is a sham if

9  the bride and groom did not intend to establish a life together

10  at the time they were married. Conduct and lifestyle before and

11  after marriage is relevant to the extent it aids in determining

12  the intent of the parties at the time they were married."); <u>Pena-</u>

13  <u>Urrutia v. INS</u>, 640 F.2d 242 (9th Cir. 1980)("It is entirely

14  appropriate for the INS to [inquire] into the marriage to the

15  extent necessary to determine whether it was entered into for the

16  purpose of evading the immigration laws. A marriage is a sham if

17  the bride and groom did not intend to establish a life together

18  at the time they were married."); <u>United States v. Tagalicud</u>, 84

19  F.3d 1180, 1185 (9th Cir. 1996)("a marriage [is] a sham if the

20  bride and groom did not intend to establish a life together at

21  the time they were married"); <u>Oropeza-Wong v. Gonzales</u>, 406 F.3d

22  1135 (9th Cir. 2005)("To determine the bona fides of the

23  marriage, the proper inquiry is whether [the parties] intended to

24

25  establish a life together at the time they were

26  married.")(applying 8 U.S.C. § 1186a(c).

27  7 - OPINION & ORDER

28

ceremony or legality--the taking of those steps which enable a couple lawfully to live together in a marital relationship. It is talking about the marital relationship itself--an actual joining together as husband and wife.

In Nakamoto, the immigrant lived with her second husband and their son in Hawaii. The INS commenced removal proceedings against Nakamoto, alleging that under 8 U.S.C. §227(a)(1)(G)(ii), Nakamoto had procured her visa by fraud. Nakamoto had initially entered the country after marrying her first husband, Del Rosario, who was a United States citizen. Nakamoto and Del Rosario's courtship had commenced with five years of letters. Del Rosario then proposed and flew to the Philippines to marry Nakamoto in 1992. Del Rosario stayed in the Philippines for four days after the marriage ceremony before returning to Hawaii. After Del Rosario returned to Hawaii, the relationship began to deteriorate. Shortly after Del Rosario left, Nakamoto discovered that Del Rosario had a girlfriend in Hawaii. Nakamoto refused to go to Hawaii and wrote to Del Rosario requesting a divorce.

The marriage was not dissolved, and Nakamoto continued to write to Del Rosario for the next two years. In 1995, three years after the marriage, Nakamoto agreed to join Del Rosario in Hawaii. They spent two nights together in Hawaii, but did not live together after that. Nakamoto subsequently met Daryl Nakamoto and gave birth to their son. In 1997, Nakamoto brought suit to dissolve her marriage to Del Rosario; Del Rosario counterclaimed for an annulment of the marriage. In April 1997, the Hawaii family court entered a decree of annulment on the ground that Nakamoto had

8 - OPINION & ORDER

fraudulently obtained Del Rosario's consent to the marriage.[2]

The issue in <u>Nakamoto</u> was whether she was subject to removal on the ground that she had entered into the marriage with Del Rosario for the purpose of obtaining an immigration benefit. 363 F.3d at 877. The Immigration Judge (IJ) determined on September 10, 1999, that the INS had met its initial burden of proof and that the Hawaii family court's annulment order and the letters submitted as evidence "prove[d] that the marriage was a sham from the start." <u>Id.</u> at 878. In denying Nakamoto relief from removal, the IJ acknowledged that Nakamoto had "exceptional and outstanding equities" of family ties and a good work history, and that her removal would "cause terrible harm to [her] United States citizen son." <u>Id.</u> Nevertheless, the IJ wrote that "she could not show by a preponderance of the evidence that she did not enter into the marriage for purpose of evading immigration laws," because "[t]here [was] little or no conduct before or after the marriage to show commitment. The time they spent together is negligible and there are no joint assets." <u>Id.</u>

The Ninth Circuit affirmed, stating that the "focus of our inquiry is whether Nakamoto and Del Rosario intended to establish

_____

[2] The Hawaii family court's conclusion was based on evidence that Nakamoto made misrepresentations with the intent to induce Del Rosario to marry her and that Del Rosario relied on Nakamoto's representations to his detriment. 363 F.3d at 883. This is all the detail that can be gleaned from the Ninth Circuit opinion.

9 - OPINION & ORDER

1  a life together at the time they were married." Id. at 882, citing
2  Bark, 511 F.2d at 1201. The court noted that although evidence that
3  the parties separated after the marriage was relevant to
4  ascertaining whether they intended to establish a life together at
5  the time of marriage, evidence of separation cannot, by itself,
6  support a finding that the marriage was not bona fide. Id.

7     The court examined the objective evidence that supported a
8  finding that the couple entered into the marriage with an intent to
9  establish a life together, and the evidence suggesting that
10 Nakamoto "married Del Rosario for immigration purposes, and that
11 the marital agreement was not fulfilled." Id. But the evidence the
12 court found to be the most "daunting hurdle" for Nakamoto was the
13 Hawaii family court's judgment of annulment. Id. at 883. Although
14 the annulment itself was "not dispositive," the Hawaii court's
15 finding that Del Rosario's consent to the marriage had been
16 obtained by fraud was entitled to full faith and credit. Id. The
17 court concluded that substantial evidence supported a finding by
18 clear and convincing evidence that Nakamoto committed marriage
19 fraud. Id. at 882.

20    Petitioner argues that document fraud cannot conclusively
21 establish marriage fraud under 8 U.S.C. § 1154(c) because document
22 fraud says little or nothing about the defining question: the
23 intent of the parties to make a life together.

24    The FO decision found that under the Family Code of the
25 Philippines (quoted in the decision) Mrs. Hlavinka could have filed
26 a Declaration of Presumptive Death prior to the Floyd marriage.
27 Under the Family Code, such a declaration makes a subsequent
28 marriage valid if the previous spouse has been absent for four

10 - OPINION & ORDER

consecutive years and the declarant has "a well-founded belief that the absent spouse was already dead." In case of disappearance where there is danger of death, an absence of two years is sufficient. The FO decision concludes:

> the beneficiary could have filed for a Declaration of Presumptive Death prior to her marriage to Wendell Floyd in order to be legally free to marry. ... Instead, the beneficiary chose to claim the status as a widow on her marriage license, and the beneficiary and petitioner chose to submit a fraudulent death certificate ... in support of the beneficiary's visa petition.

Exhibit C p. 2-3. An implication of this discussion is that failure to take this simple step reflects a lack of intent to make a life together.

The decision also states that the Petition for Dissolution and Annulment filed in Columbia County Circuit Court, dissolving the Floyd marriage, was submitted to the USCIS by Mr. Floyd, and was accompanied by an affidavit signed by Mr. Floyd stating that his marriage to Mrs. Hlavinka was fraudulent. The decision concludes:

> [A] review of the entire record of proceeding indicates that the beneficiary conspired to enter into a bigamous marriage with Wendell Floyd for the purpose of evading immigration law and entering the United States. She knew she was not legally free to marry Wendell Floyd as she was already married at the time. If the beneficiary had the intention of pursuing a true spousal relationship with Wendell Floyd, she would have taken the necessary legal steps to dissolve her first marriage.

Id. at p. 3-4. The respondents assert that the petition must be dismissed because Mrs. Hlavinka explicitly admitted on her I-485 that she "submitted fra[u]dulent death certificates for [her] first husband" in order to convince the United States that she was "validly married in order for [her] to obtain [her] immigrant visa to enter the United States." Petition ¶ 18; Respondent's

11 - OPINION & ORDER

Memorandum, Exhibit A p. 5.

Considering the record as a whole, I conclude that USCIS has met its burden of showing that Mrs. Hlavinka and Mr. Floyd did not have the intent to make a life together. Besides the fraudulent death certificate, there is the affidavit from Mr. Floyd stating that he was tricked into marrying Mrs. Hlavinka, and that the marriage was fraudulent, the fact that Mrs. Hlavinka resided with Mr. Floyd for only about three months; and the fact that Mrs. Hlavinka remained in the United States after the Floyd marriage was dissolved and then married Mr. Hlavinka a few months after the final decree was entered and USCIS revoked her conditional permanent resident status.

### Conclusion

Respondents have carried their burden of demonstrating that substantial evidence supports a finding, by clear and convincing evidence, that Mrs. Hlavinka and Mr. Floyd did not have the intent to make a life together, and therefore that Mrs. Hlavinka committed marriage fraud.

Respondents' motion to dismiss (doc. # 11) is GRANTED. Petitioner's motion for summary judgment (doc. # 21) is DENIED AS MOOT.

IT IS SO ORDERED.

Dated this 6th day of August, 2009.

/s/ Dennis James Hubel

1    _____          Dennis James Hubel
                                        United States Magistrate Judge
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28